Hoffman, Justice.
First. The domicil and residence of the defendant in Norwalk, Connecticut, down to August, 1856, must be conceded, I think, upon the defendant’s own papers; and 1 feel justified in concluding, that it subsisted until the fall of 1857, when the deed to his son was recorded. He voted in Norwalk at the presidential election of November, 1856. He is retained upon the tax list of that town, and on the list of persons subject to a poll tax, for even the year 1858.
Second. During much of the year 1857, and down to October of that year, he occupied a room at the Astor House, without any part of his family, and frequently visited Norwalk. There his family dwelt during that period.
Third. In October, 1857, he took rooms at the St. Nicholas Hotel, and occupied the same with his wife and one child. There he remained until January, 1858, when he vacated the rooms and went to Norwalk. In March, his wife and child returned, and spent a few days at the St. Nicholas. His sickness which began in January, ceased in April, so far as that the physicians were discharged; and upon his own affidavit ended the latter part of May. We have no evidence- of a residence for a day in New-York, during April or until the latter part of May, when he took a room, with occasional visits to Norwalk, and a visit to Saratoga for his health.
Fourth. When he left the St. Nicholas Hotel in January, his rooms were absolutely given up. When his wife returned for a few days in March, she occupied a room like other transient guests, and the same was the case when he returned at the end of May. His statement as to leaving , some articles at the hotel is much too vague to form a ground of decision. *551 They must have been trifling; the clerks have not been called upon to corroborate the statement.
Fifth. The advice which Hendricks gave the defendant, in the fall of 1857, to remove his family to Hew-York, was given and acted upon expressly from the apprehension that his then residence was in Horwalk, or might be so considered. The removal was to effect the object of avoiding the attachment laws if possible, not with a full intention to fix himself permanently in Hew-York. He voted in Hew-York at the last election for mayor.
The attachments in these suits were sued out respectively on the 13th day of April, the 22d day of May, the 4th day of June, the 18th day of June and the 1st day of July, 1858.
These facts present two striking points:
First. Of a clear case of domicil and residence at Horwalk down to the fall of 1857; and next, that at the time of issuing two of the attachments, there was no actual residence in this city, and had not been for about four months, but an actual residence in Horwalk, without the least connection with a residence in Hew-York by ownership of, or hiring a house, or even a room within it.
The character of the residence, from October, 1857, to January, 1858, may perhaps present a very different case from that which will arise upon the facts subsequently, and might have exempted the defendant from the provisions of the attachment law. But from January to the end of May, he had entirely detached himself from every semblance of residence in Hew-York, and had resumed his former domicil and dwelling. A more difficult question may be in relation to the other three attachments sued out, when he was in the actual occupation of a room in the hotel, had been so for over a month, and continued so for some time afterwards, with occasional absences.
It is to my mind clear, that his domicil, for the purposes of succession, testacy or intestacy, liability to taxation and enjoyment of the privilege of voting, continued through the whole period, and was, at the date of each-of the attachments, in Horwalk.
*552 The opinion of the master of the rolls in Sommerville agt. Sommerville, (5 Vesey R. 786,) is as sure a guide upon this question as can be found.
The domicil established upon the facts in the present ease, is like the domicil of origin constituted there, “ and it is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicil, and taking another as his sole domicil.”
So, Lord Cottenham says, in Munro agt. Munro, (7 Clark & Fin. Rep. 77 :) “ To effect the abandonment of the domicil of origin and substitute another in its place, is required le concowrs de la vobnte et du fait—animo et facto ; that is, the choice of a place, actual residence in the place then chosen, and that it should be the principal and permanent residence.”
The case of' Somerville agt. Anderson, (22 Eng. Law & Eq. Rep. 614, and before the Privy Council, 29 id. 59,) applied the same rules t'o a domicil of choice, as are applicable to one of origin. The party had lost his origin of "birth by residence in England, with intention to abide there; and was held to have lost the latter domicil from a residence in France, keeping house for thirteen years -there, with only occasional absences, and to have acquired one in France. He broke up entirely his English establishment upon removing to France.
In Evins agt. Smith, (14 Howard U. S. S. C. Rep. 400, Curtis ed., vol. 20, p. 252,) Justice Wayne, delivering the opinion of the court, says: “ It is difficult to lay down any rule under which every instance of residence could be brought which may make a domicil of choice. But there must be to constitute it, actual residence within the place, with the intention that it is to be a principal and permanent residence.”
And we find it laid down that the domicil of a married man is the place of his family’s habitual dwelling, although he may be conducting business elsewhere. (Phillimore on Domicil, § 209, &c.; Story's Conflict of Laws, p. 57; Catlin agt. Gladding, 4 Mason's Rep ; see also the elaborate opinion of Surrogate Bradford, in Isham agt. Gebbins, 1 Bradford's Rep)
*553 It is not to be denied that domicil may exist independently qf habitation, using that term as denoting merely actual abiding within a place. But contemplated habitation or rehabitation is also an element in the legal idea of domicil when actual habitation does not exist. The dwelling in one place, which is thus consistent with a continued domicil in another, is under certain circumstances called a commercial domicil, the residence negotioi-um rations, of the civil law. (Voet on the Pandects, B. 5, Tit. 1, § 98 ; Drake on Attachments, § 67.)
In Payne agt. Taylor, (10th Louisiana Rep. 726,) the suit was commenced by attachment of the property of David Taylor, as a resident of Massachusetts. He had for several years: before been dwelling in Hew-Orleans, and doing commercial business there under the name of D. Taylor & Co. In support of a motion to discharge an attachment, it was urged that his long commercial domicil made him a resident of New-Orleans, where he could always be served with process. But the motion was denied. The phrase in the Code of Louisiana is nearly the same as in our own. (See also Bryan agt. Diarse, 1 Martin's Louisiana Pep. 412, new series.)
Jackson agt. Perry, (13 Bal. Mon. 211,) is a valuable case to the point, that the ability to serve process upon a party from finding him within the state is not the basis of an attachment law against the property of non-residents. It must be admitted that several cases have countenanced the doctrine, that under the attachment law before the Code, the question depends upon the fact of a mere abiding in a place for some continuance of time, wholly irrespective of the true domicil. (In the matter of Thompson, 1 Wend. P. 45 ; Haggart agt. Morgan, 4 Sandf. Rep. 198, and 1 Selden R. 422; Bartlett agt. The City of New - York, 5 Sand. R. 46.) A very able, and to my mind satisfactory view of the cases, is to be found in the opinion of Justice James, in Houghton agt. Ault, (16 Howard R. 78.)
That examination is, I think, sufficient to show that those cases, (even that of Haggart agt. Morgan, in the court of appeals,) as it did not control the case before the learned judge, could not govern the present one. Still the last-mentioned *554 case, although the decision was upon the ground of the execution of the bond having concluded the party, may, perhaps, be treated as deciding that an absence of three years from an acknowledged domicil, and dwelling for that period in another place for business purposes, makes the party a non-resident of the first place within the statute.
It would be difficult to contest the truth of the converse of this decision, and to avoid holding, that if a party was dwelling habitually in Hew-York, for the same period and solely for business purposes, he would be deemed a resident of Hew-York, although his domicil was clearly elsewhere. But the principle of these cases opens the question of the nature, object and duration of absence or dwelling which is to control each particular case. It would not be pretended that the dwelling for a week for a special purpose in Hew-York made a party a resident, whose fixed habitation, or domicil was elsewhere. So we perceive that if the domicil does not supply a decisive rule, neither does the mere abiding within the place at the time of the service of the writ, furnish it; and 'thus each case must be left to the operation of all the rules usually applied to determine similar questions.
When this is conceded, then the case is open to the important consideration urged by Mr. Justice James, that the attachment under the Code differs from that under the Revised Statutes, in this, that it is not a process for the commencement of an action, but is an arrest of the party’s property in the nature of bail, for the payment of such judgment as he may obtain; that the statute was intended to give a remedy to creditors, whose debtors being absent could not be served with process, though domiciled within the state. The case of Houghton agt. Ault, decided at special term by Justice James, was affirmed at general term of the 4th district. The facts were these : The defendant, a foreigner, had a family residing in Portsmouth, Canada, and there owned a ship yard. He leased a marine railway at Ogdensburgh, in July, 1856, began business there and carried it on until the issuing of an attachment in December, 1857. During this period he was most of the time at Og *555 densburgh, his family keeping house in Portsmouth. He continued to do work also at the latter place, where he had property to a considerable amount.
It was held, that his legal residence was in Canada, and a motion to discharge an attachment which had been issued was denied. The case of Lee agt. Stanley, (9 How. Pr. R. 272,) is referred to by the learned judge, and approved. There, the defendant kept a house in Bradford, Hew-Hampshire, where his wife and family resided, in which he entertained his friends, and was called by him his home. He had a store of goods and was doing business in Franklin county in this state. . He appeared to have divided his time about equally between those two and a third place; an attachment was sustained by Judge Clerke. He adopted the rule stated by Mr. Justice Paige, in Crawford agt. Wilson, (4 Barbour's R. 504,) that the terms legal residence, inhabiting, and domicil, mean the same thing, with few exceptions,, and that the domicil in Hew-Hampshire remained unchanged.
Barry agt. Bockover, (6 Abbott's Reports, 374, April term, 1858,) was before this court at general term. The question arose upon the following facts, on a motion to discharge an attachment. The defendant was one of a firm doing business in Hew-York since January, 1854. He spent the whole of every business day in Hew-York, with the exception of occasional absences from sickness, or absence on business of the firm. All his working capital was invested in Hew-York, where his individual bank account as well as that of his firm was kept. He had spent eight hours of every business day in the city. Process could always have been served upon him, and was actually served at his store. His family, however, resided in Jersey City, in a house hired by him, and he slept there every night, with occasional absences, and remained there regularly from Saturday night to Monday morning. He owned no real estate in Jersey City. It was held that he was a non-resident, and an attachment was sustained by the court.
These cases appear to me to have restored the criterion of domicil to a strong, if not controlling influence upon these *556 questions under the Code. Indeed, they decide little more than is contained in the early ease of Fitzgerald, (2 Caines, 318.) The law of domicil has sprung from the Civil Code, and we may with advantage resort to the exposition of that law upon the subject. The statement of its rule generally found in treatise and decisions is, ubi quis larem ac fortunarum suarum sum-mam constituit. The residue of the passage is, Unde rursus non sit discessurus si nihil avocet; unde cum profectus est, peregrinan videtur, quo si recliit, peregrinan jam destitit. (Domat, vol. 2, p. 484.)
What is the meaning of the word larem in this definition ? Lord Rosslyn in the Douglass case, (see 5 Vesey Rep. 758,) adverts to an expression in one of the letters in evidence that the writer did not mean to set up his tabernacle in Scotland, and speaks of this phrase as a fair interpretation of the word larem. If we look to its signification in writers of acknowledged authority, it will be found to designate, either the tutelary deity of the hearth, or the only home of the family.[1]
In either sense, Norwalk constituted the larem of the defendant. So all that we can gather from the papers before us, as to the mass of his fortune, (summam fortunarum,) indicates the possession of a homestead in Norwalk, while his floating capital was in New-York, in the midst of agitation and peril. In the fall of 1857, “ his commercial embarrassments began,” and we may infer from the result that such capital was inadequate to meet his debts. Then it was that the deed of the homestead to his son was recorded, and then the advice to remove his family to New-York was given and acted upon. I may also refer to the comprehensive statement of the legal *557 meaning of the term in an eminent French author: “ They who have no intention of fixing their domicil in a place, but are absent somewhere for convenience, necessity or business, cannot by any lapse of time create a domicil; neither the intention without the fact nor the fact without the intention is sufficient for this.” (D'Argentie, art. 9, § 4, cited by Phillimore on Domicil, p. 11, Law Library, vol. 41.)
*556 ■ [1] DU penates meant parenium familiaque Lar pater, vdbis manilo; meumparehtwn rem bene ut tutemini; ego mihi, diios déos penates, persequar, alium Larem. (Plautus.) Laribus in foco, penatrálilms, in atrio, aul interiore tedium parte sacra Jiebant. (Ibid.) Omnium tedium; ac familiarum dii erara!; usque focus peetdiariter sacer ei-at. (Forcellini Lexicon in verbo.)
Moa binas, aut amplias domos continuare nobis larem familiarum nus-quam ulltm case. (Sallust.)
The definition Domicilium in the Dictionary of ForceUini et cura Facciolati is, Domus, JSdes, Domestica Edbitatio. (In Verbo.)
*557 I do not think that this subject can be properly treated without adverting to the important decisions in admiralty respecting the residence of a citizen in an enemy’s country, to subject his property to seizure and condemnation in time of war. The authorities before Sir William Scott, are all cited and commented upon in the great case of The Venus, (8 Cranch R. 253,) in the opinions of Justice Washington and Chief Justice Marshall.
It is sufficient for me to say, that the governing rule was admitted to be the removing from an established domicil, with the intention of making a permanent settlement, or for an indefinite time elsewhere. With such an intention the right of the domicil might be acquired upon a residence of even a few days. It was admitted in the case that the claimants had acquired a right of domicil in Great Britain, at the time of the breaking out of the war; and thus the question was, what was the consequence of the capture of such a person’s property on the high seas ?
I think that upon the application of the leading principles and cases I have thus referred to, the legal conclusion is, that the defendant Wilson, was not a resident of New-York at the date of these attachments. Through all the periods of his business prosperity, we find his domestic hearth and his household comforts at Norwalk—bis hopes of the enjoyment of the fruits of his labor there concentrated ; in adversity, we find that he turns to the same place for respite and repose. It is only when the struggle with hostile fortune had begun, and the apprehension arose, that his property might be swept away from the purposes to which he might wish to destine it, that he brought his family to reside temporarily in New-York. It *558 is impossible, I think, to look upon him as more than a sojourner in this city, with no intention of remaining there fixedly, but with an intention in all the vicissitudes of his business and of life, of permanently resting at Norwalk.
The motion to discharge the attachments must be denied, with $7 costs in each case.